UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| GARY DALE YOUNG, | ) |
| Plaintiff, | ) |
| v. | ) No. 2:11-00105 |
| | ) Judge Sharp |
| PATRICIA VEGA, | ) |
| Defendant. | ) |

## MEMORANDUM

Pending before the Court are Cross Motions for Summary Judgment filed by Plaintiff Gary Dale Young (Docket No. 20) and Defendant Patricia Vega (Docket No. 21). Those Motions have been fully briefed by the parties and, for the reasons that follow, Defendant's Motion will be granted while Plaintiff's Motion will be denied.

### I. FACTUAL BACKGROUND

Plaintiff is a resident of Fentress County, Tennessee. Defendant is a Case Manager, Upper Cumberland Region, for the Tennessee Department of Children's Services ("DCS").

Plaintiff is the father of a minor child, J.M., and resided with the child's mother, Amanda McKinney, and her three minor children, including J.M., the middle son. Plaintiff claims, however, that he moved out of the residence shortly before the events at issue in this litigation took place.

On June 1, 2010, DCS received a referral alleging that Ms. McKinney's three minor children were suffering from lack of supervision and medical maltreatment. DCS assigned the case to Defendant. On September 21, 2010, DCS received another referral related to Ms. McKinney's minor children, this time alleging that the children were being exposed to drugs and that Plaintiff

1

had physically abused L.M., one of the minor children in the household.

On September 27, 2010, a meeting was held at the DCS office. Plaintiff and his family attended the meeting, along with several persons from the DCS, including Defendant. Defendant did not conduct the meeting, or (so far as Plaintiff can recall) make any statements at the meeting.

At this meeting, J.M. was removed from the physical custody of Plaintiff and placed with his brother. Defendant claims that this was done with Plaintiff's consent, while Plaintiff alleges that he was coerced into allowing his child to stay with relatives that evening.

The following day, DCS filed a Petition to Declare Children Dependent and Neglected and For Temporary Emergency Legal Custody in the Fentress County Juvenile Court. The petition alleged, in part, that Plaintiff had physically abused L.M. and had used illegal drugs in the presence of the three minor children. DCS requested that the Court remove the minor children from Ms. McKinney's and Plaintiff's custody, prohibit contact between Plaintiff and J.M., and place J.M. with his aunt and uncle. Defendant signed the Petition, certifying that the facts stated therein were true based upon her knowledge, information, and belief.

The Fentress County Juvenile Court entered a Protective Custody order on September 28, 2010, removing J.M. from Plaintiff's custody. The court also entered an Emergency Restraining Order, finding all three children to be dependent and neglected, and forbidding contact between Plaintiff and the children pending further order of the court.

On September 30, 2010, DCS filed an Amended Petition, adding a number of allegations to the original petition. Those new allegations were provided to Defendant by Laurie Seber, the attorney for DCS based upon information that the attorney received. As before, Defendant signed the Amended Petition, certifying that the facts stated therein were true based upon her knowledge,

information, and belief. Plaintiff entered into an agreement with the DCS on October 5, 2010, that allowed him to have unlimited, albeit supervised,[1] visits with his child.

A preliminary hearing before the Fentress County Juvenile Court was scheduled for September 30, 2010. That hearing, however, was postponed until October 28, 2010.[2]

At the hearing on October 28, the juvenile court found probable cause to remove the children from Ms. McKinney's home (where Plaintiff had lived), and that there was no less restrictive alternative to the removal. Nevertheless, the Court awarded temporary custody of J.M. to Plaintiff.

The final hearing on DCS's Amended Petition was held on May 25, 2011. At the hearing, the court awarded permanent custody of J.M. to Plaintiff.

Plaintiff concedes that J.M. is now in a safer and better situation than he was before DCS intervened and convened the family meeting on September 27, 2010. He also concedes he has no idea what Ms. McKinney or her mother, Diana Pugh, may have reported to DCS prior to the filing of the petitions with the juvenile court.

As indicated, the petitions which led to J.M.'s removal and placement with relatives contained numerous allegations against Plaintiff, including the use of drugs around the minor children, and physical abuse. Some of those allegations were investigated by Defendant; some were not.

Defendant never personally investigated whether Plaintiff or Ms. McKinney used drugs

---

[1] The visits were to be supervised by Randy or Jacqueline Young, Plaintiff's brother and sister-in-law.

[2] There is a conflict in the record as to the reason for the rescheduling of the hearing. Defendant contends that it was continued at the request of Melanie Lane, Plaintiff's counsel, so that she could talk to and/or depose Defendant. Plaintiff insists that counsel made no such request, and the hearing was unilaterally continued by the court.

3

around the children.[3]  Rather, Defendant stated in the petitions that the same was reported to her.

Similarly, Defendant never personally investigated whether Plaintiff shook J.M.  Instead, Defendant reported that she was "made aware that the boyfriend [Plaintiff] had gotten ahold of [J.M.] and shaken him." (Docket No. 30 at 173).

Defendant also did not investigate a report that Plaintiff hit J.M. with a belt.  However, that alleged incident was reported to her by L.M.

Similarly, while Defendant reported that Plaintiff had perpetrated domestic violence on Ms. McKinney, she did not personal investigate that matter, other than to talk to Ms. McKinney who previously had said that Plaintiff threatened to kill her, but denied the allegation that she had been hit by Plaintiff.  At the time of the denial, Defendant believed little of what Ms. McKinney told her and, regardless, the incident had been reported to her by Ms. McKinney's mother, Diana Pugh.

Defendant did investigate an allegation that Plaintiff had bruised L.M. by speaking to several individuals, but received conflicting reports.  L.M. initially told Defendant that he had been bitten by a dog, but when Defendant told him she did not believe that a dog bite caused the bruise, L.M. told her that "Gary" caused the bruise.  The day before the Amended Petition was filed on September 30, 2010, L.M. told another DCS case worker that his father, Doug Sells, caused the bruise.

Defendant also spoke to Ms. McKinney who reported that the bruise was the result of L.M. falling while at Mr. Sells' house where L.M. stayed on September 18 and 19, 2012.  Upon being interviewed by Defendant, Mr. Sells admitted to hitting L.M. on the bottom with a fly swatter on

---

[3]  The August 25, 2010 referral was apparently the first time that the DCS learned of concerns that Plaintiff and/or Ms. McKinney may have used drugs around the children.

4

Case 2:11-cv-00105  Document 49  Filed 10/10/13  Page 4 of 12 PageID #: 581

September 19, 2010, the day before the bruise was discovered. His wife, Julie Sells, confirmed that her husband had hit L.M. with a fly swatter while the child was wearing only his underwear.

At some point (perhaps at the family counseling meeting), Plaintiff denied hitting L.M. He further claims that he did not have access to L.M. when the bruise was acquired.[4]

In both the initial and Amended Petition, Defendant stated DCS had received a referral reporting "that Gary Young had hit [L.M.] on his buttock area and left a large welt on [L.M.'s] left butt cheek." (Docket No. 30 at 173 & 186). Neither petition indicated that Plaintiff denied hitting L.M., that Plaintiff may not have had access to L.M. during the relevant time, that Sells' admitted hitting his son with a fly swatter, that Ms. Sells confirmed that L.M. had been hit with a fly swatter, or that L.M. later stated to a DCS caseworker that Mr. Sells was responsible for the bruise.

Based upon the foregoing events, Plaintiff filed suit in this Court under 42 U.S.C. § 1983 against Defendant in her individual capacity. In the Amended Complaint, Plaintiff alleges that he was deprived of his Fourteenth Amendment liberty interest in the care, custody, and control of his minor child without due process of law, and specifically alleges for his sole "Cause of Action" the following:

> Defendant, Patricia Vega's, intentional misrepresentations in her verified petition to the Fentress County Juvenile Court led to the removal of J.M. from Plaintiff, Gary Dale Young's, custody and the Restraining Order which precluded Plaintiff from all contact with this minor child. This conduct deprived Plaintiff, Gary Dale Young, of his fundamental liberty interest in the care, custody, and control of his minor child without due process of law guaranteed to him by the Fourteenth Amendment to the United States Constitution.

(Docket No. 6, Complaint ¶ 48).

## II. LEGAL DISCUSSION

---

[4] Whether Defendant actually knew that Plaintiff may not have had access is unclear.

As stated at the outset, the parties have filed Cross-Motions for Summary Judgment. Because the standards governing motions for summary judgment are well known, the Court will not reiterate them here, other than to say that "[t]he standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." Ferro Corp. v. Cookson Group, PLC, 585 F.3d 946, 949 (6th Cir. 2009).

Turning to the substance of the Motions, Plaintiff argues that Defendant deprived him of procedural and substantive due process by "intentionally misrepresenting . . . almost every material fact related to Plaintiff" in the petitions, and by omitting important information that was known to her. Defendant argues that she did not violate Plaintiff's constitutional rights and that, regardless, she is entitled to absolute and/or qualified immunity.

Having considered the record and the arguments of the parties, the Court concludes that Defendant is entitled to summary judgment.

As a preliminary matter, Plaintiff does not make clear how he was deprived of procedural due process. "In order to establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." Albrecht v. Treon, 617 F.3d 890, 894 -895 (6th Cir. 2010) (quoting, Women's Med. Prof'l Corp. v. Baird, 438 F.3d 595, 611 (6th Cir. 2006)). Property interests "are defined by existing rules or understandings that stem from an independent source such as state law-rules[.]" Id. (Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577(1972)).[5]

---

[5] Even though "property rights are principally created by state law, whether a substantive interest created by the state rises to the level of a constitutionally protected property interest is a question of federal constitutional law" and "[t]he due process clause only protects those interests to which one has a legitimate claim of entitlement." Waeschle v. Dragovic, 576 F.3d 539, 544-45 (6th Cir. 2009).

Moreover, "'state intervention in the relationship between a parent and child must be accomplished by procedures meeting the requisites of the Due Process Clause,'" and "[t]hus, even for temporary deprivations of custodial rights, parents are generally entitled to a hearing 'within a reasonable time.'" Teets v. Cuyahoga County Ohio, 460 Fed. Appx. 498, 503 (6th Cir. 2012) (citation omitted).

In his brief, Plaintiff points to Tenn. Code Ann. § 37-1-114 and § 37-1-128, the former of which provides that "a child taken into custody shall not be detained or placed into shelter care prior to the hearing on the petition unless there is probable cause to believe that the child: . . . is a neglected, dependent or abused child," and the latter of which provides, in relevant part:

> (2) When the court finds, based upon a sworn petition or sworn testimony containing specific factual allegations, that there is probable cause to believe that the conditions specified in § 37-1-114(a)(2) exist and the child is in need of the immediate protection of the court, the court may order that the child be removed from the custody of the child's parent, guardian, legal custodian or the person who physically possesses or controls the child, pending further investigation and hearing for a period not to exceed three (3) days, excluding Saturdays, Sundays and legal holidays. In no case shall such order remain in effect for more than two (2) days, excluding Saturdays, Sundays and legal holidays, unless a petition is filed within the two-day period. If the child is not returned to the parent, guardian or legal custodian within such three-day period, a hearing shall be conducted pursuant to § 37-1-117(c). The provisions of the preceding sentence may be waived by express and knowing waiver, by the parties to an action . . .

Tenn. Code Ann. §§ 37-1-114(a)(2) and § 37-1-128(b)(2).

Here, it is clear that a hearing was not held in the Fentress County Juvenile Court within the time set by the statute and, in their filings, the parties make much ado about the factual dispute as to the reasons for the continuance of the hearing. Yet, even if the case was continued by the Juvenile Court as Plaintiff insists, or was continued at the request of Plaintiff's counsel as Defendant insists, neither position suggests that Defendant was responsible for the continuance.

7

"Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior." Heyerman v. County of Calhoun, 680 F.3d 642, 647 (6th Cir. 2012). In other words, "personal liability "must be based on the actions of that defendant . . . and not based on any problems caused by the errors of others, either defendants or non-defendants.'" Id. (citation omitted). In this case, Defendant was not responsible for continuance of the hearing – that was done by somebody else.

Procedural due process aside, "'[s]ubstantive due process . . . serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used,'" and "may be loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.'" Pittman v. Cuyahoga Cnty. Dep't of Children & Fam. Servs., 640 F.3d 716, 728 (6th Cir. 2011) (citations omitted). Present Plaintiff's "claim deals with the first type of deprivation – deprivation of a constitutional guarantee, particularly the right to the maintenance of a parent-child relationship." Kolley v. Adult Protective Serv. 725 F.3d 581, 585 (6th Cir. 2013). "While 'the Supreme Court has repeatedly reaffirmed the existence of a constitutional right to the maintenance of a parent-child relationship,' that right is 'neither absolute nor unqualified.'" Id. (citation omitted). "Thus, a government investigation of child abuse will not automatically implicate the right to familial association . . . absent 'evidence of bad faith, improper motive, or investigation tactics that 'shock the conscience.'" Id.

Plaintiff alleges that his right to maintenance of the parent-child relationship was violated by Defendant's conduct, including her failure to conduct an adequate investigation. He also argues that Defendant included some information in the Petitions, but left other information out of those Petitions, and those selected inclusions and omissions resulted in intentional misrepresentations to

8

the Fentress County Juvenile Court that ultimately led to his losing custody of J.M. on September 27, 2010, albeit for a relatively brief time. The Court finds that Defendant is entitled to absolute and/or qualified immunity on these allegations.

"The defense of absolute immunity provides a shield from liability for acts performed erroneously, even if alleged to have been done maliciously or corruptly," Dean v. Byerley, 354 F.3d 540, 554 (6th Cir. 2004), and, "under certain circumstances, social workers are entitled to absolute immunity." Holloway v. Brush, 220 F.3d 767, 774 (6th Cir. 2000) (*en banc*). Specifically, the Sixth Circuit has "recognized that social workers are entitled to absolute immunity when they engage in conduct 'intimately associated with the judicial phase of the criminal process.'" Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs., 724 F.3d 687, 694 (6th Cir. 2013) (quoting, Pittman v. Cuyahoga Cnty. Dep't of Children & Fam. Servs., 640 F.3d 716, 724 (6th Cir. 2011)). "'In other words, 'social workers are absolutely immune only when they are acting in their capacity as legal advocates – initiating court actions or testifying under oath – not when they are performing administrative, investigative, or other functions.'" Id. (internal quotation marks omitted).

Based on this standard, social workers are absolutely immune from liability when they file an affidavit with the juvenile court reflecting their opinion as to what is in the best interest of the child. Pittman, 640 F.3d at 725. Likewise, "filing [a] complaint for abuse, neglect, and temporary custody" that "inititat[es] formal court proceedings is clearly prosecutorial in nature under this standard and thus protected by absolute immunity." Kovacic, 724 F.3d at 694. "Similarly, preparing a [Temporary Emergency Care] Order, which precedes the filing of the complaint, [i]s prosecutorial in nature under this standard and thus also protected by absolute immunity." Id.

Plaintiff's present allegations fall squarely within the holding of a couple of Sixth Circuit

9

decisions granting absolute immunity to social workers. In Rippy ex rel. Rippy v. Hattaway, 270 F.3d 416 (6th Cir. 2001), the Sixth Circuit observed that "[t]he case law makes little distinction between prosecutors and social workers who initiate judicial proceedings relating to the welfare of a child," and, hence, social workers "are entitled to absolute immunity while functioning in roles intimately associated with the judicial phase of proceedings." Id. at 422. Further, because decisions regarding child placement are for the juvenile court to make under Tennessee law, and because the DCS acts in an advisory role "in much the same fashion as probation officers who make sentencing recommendations to criminal courts," the making of such recommendations, including the "underlying investigations is similarly intimately related to the judicial phase of the child custody proceedings." Id. at 422-23.

In Pittman, the Sixth Circuit cited Rippy for the proposition that absolute immunity protected a social worker from the claim that, as a result of "an inadequate investigation," the complaint and affidavits before the juvenile court contained "allegedly false assertions." Pittman, 640 F.3d at 726. More importantly as far as this case is concerned, the Sixth Circuit held that "[w]hether [the social worker] made intentional misrepresentations to the juvenile court in the complaint and affidavits does not affect the conclusion that she is entitled to absolute immunity," writing:

> As this Court has recognized, prosecutorial immunity applies "so long as the general nature of the action in question is part of the normal duties of a prosecutor," even when that immunity "bar[s] § 1983 suits arising out of even unquestionably illegal or improper conduct by the prosecutor." Cady v. Arenac Cnty., 574 F.3d 334, 340 (6th Cir. 2009). Pursuant to this rule, prosecutors do not forfeit their absolute immunity when they knowingly make false statements while advocating before the court: "Like witnesses, prosecutors and other lawyers were absolutely immune from damages liability at common law for making false or defamatory statements in judicial proceedings (at least so long as the statements were related to the proceeding), and also for eliciting false and defamatory testimony from witnesses." Burns v. Reed, 500 U.S. 478, 489–90, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). Because absolute immunity for social workers is akin to absolute immunity

10

for prosecutors, the same protection must apply here, no matter how undesirable the results. In the words of Chief Judge Learned Hand, absolute immunity represents "a balance between . . . evils"; "[I]t has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." Gregoire v. Biddle, 177 F.2d 579, 581 (2nd Cir. 1949)[.]

Id. at 725-6.

Absolute immunity aside, the court in Pittman also discussed qualified immunity in the context of a substantive due process claim that plaintiff was deprived of his "fundamental liberty interest in parenting[.]" Id. at 728.[6] Finding qualified immunity to be appropriate, the Sixth Circuit stated that a social is tasked with presenting its recommendation to the juvenile court, but "[b]ecause the juvenile court has the ultimate decision-making power with respect to placement and custody, it alone could deprive [plaintiff] of his fundamental right." Id.

Just recently, and in an opinion filed after the Motions for Summary Judgment in this case were fully briefed, the Sixth Circuit found "the Pittman analysis control[ing]" where Plaintiffs alleged "that they were deprived of their substantive and procedural due process rights when the defendants: petitioned for an *ex parte* order when no emergency existed" and "falsely testified about [one parent's] actions and statements," among other things. Kolley, 725 F.3d 585 & 586. Such allegations, the court wrote, had to do with "defendants' actions *before* the court decided to deny . . . visitations rights" and "[d]espite the allegeged misrepresentations, the court was the final decision

---

[6] "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity attaches if an official reasonably believes that his actions were lawful in light of clearly established law, and this remains so although the belief is subsequently shown to be erroneous. Harris v. Bornhorst, 513 F.3d 503, 511 (6th Cir. 2008). "Thus, even if a factual dispute exists about the objective reasonableness of the [official's] actions, a court should grant the officer qualified immunity if, viewing the facts favorably to the plaintiff, an [official] reasonably could have believed that the [action] was lawful." Kennedy v. City of Villa Hills, 635 F.3d 210, 214 (6th Cir. 2011)

11

maker regarding [the child's] custody decisions." Id. at 586.

Here, in both the Petition and the Amended Petition, Defendant repeatedly represented that various allegations were based upon what was reported to her; there is no proof presented that she did not receive those reports. True, Defendant did not include all that she learned or identify and include all conflicting information, but there is no suggestion that the information she did include was made-up out of whole cloth. Further, and any omissions aside, the information Defendant received presented significant cause for concern for the welfare of the children in the home, including threats of physical violence. While the already lengthy petitions could have included more information and while Defendant (perhaps) could have conducted a more thorough investigation, the allegations in this case contain much of the same type of conduct and circumstances for which the Sixth Circuit in cases like Rippy and Pittman have found immunity to attach. Accordingly, Defendant is entitled to immunity and, as a consequence, summary judgment.

## III. CONCLUSION

On the basis of the foregoing, the Court will grant Defendant's Motion for Summary Judgment, and deny Plaintiff's Motion for Summary Judgment.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

12